UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ASHOK JAIN, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-10-2119 |
| | § | |
| TEXANA BEHAVIORAL HEALTHCARE & | § | |
| DEVELOPMENTAL DISABILITIES | § | |
| SERVICES; dba TEXANA CENTER, | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Pending before the Court is Defendant Texana Behavioral Healthcare & Developmental Disabilities Services' ("Texana") motion for summary judgment. Doc. 41. Texana contends that the Plaintiff, Ashok Jain, cannot make out a *prima facie* case for employment discrimination or retaliation under Title VII and that Texana therefore is entitled to summary judgment.

Having considered Defendant's motion, the facts of this case, and the relevant law, the Court finds that Texana is entitled to summary judgment in its favor on all of Jain's claims.

I. Background

This case arises out of Texana's purportedly discriminatory treatment of psychiatrist Ashok Jain during his employment in the Texana East Fort Bend Behavioral Health Clinic. *See* Doc. 23-2; Doc. 43. Jain asserts that he earned his bachelor's degree in medicine and surgery and a medical degree in psychiatry in India, performed residencies in Delhi, India, and the University of Texas Health Science Scenter at Houston, interned at the Brooklyn Hospital Center, and is certified by the American Board of Psychiatry and Neurology in General Psychiatry, Forensic Psychiatry, and Pain Medicine. Doc. 42.

On April 16, 2007, Jain signed an employment agreement with George Patterson, acting as the CEO of Texana Center, by which Texana would employ Jain as a psychiatrist in Texana's East Fort Bend Behavioral Health Clinic at an annual salary of $155,000. Doc. 43. The agreement was "for a period of fourteen months, beginning July 1, 2007 and continuing until August 31, 2008." *Id.* Attachment B to that agreement specified that Jain would work from 8:00 am to 5:00 pm, Monday through Friday. *Id.* at 6.

On September 1, 2007, Patterson and Jain entered a new employment agreement, which superseded the previous agreement, maintained the previous terms of Jain's employment, but raised Jain's salary to $165,000 annually. Doc. 43-1. That agreement was to be effective until August 31, 2008, also.[1] *Id.* at 2. Texana has introduced Patterson's affidavit testimony in which he states that he "negotiated a second Employment Agreement with Plaintiff for the term September 1, 2008 to August 31, 2009" (Doc. 41-2 at 1), although, to the best of the Court's knowledge, this document does not appear in the record. Nevertheless, the parties agree that an employment agreement existed between Jain and Texana pursuant to which Jain would continue his work as a psychiatrist until August 31, 2009, at an annual salary of $165,000.

At approximately the same time, psychiatrist Claire Friedman, also a Texana employee who is Caucasian, entered into an employment agreement with Texana by which Texana paid her $101,970 annually for work on a 60% part-time basis beginning September 1, 2008. Doc. 43-4.

Jain contends that, despite being "the most qualified psychiatrist employed by Texana[,] . . . he was subjected to discrimination [throughout the term of his employment with Texana] based on the simple fact that he was not white and [was] from India." Doc. 42 at 9. He alleges that this discrimination manifested itself in the fact that for the employment year from 2007 to

---

[1] Although the contract states that the agreement is "for a period of fifteen months," that phrase is clearly contradicted by the clearer terms that follow it, which state that the contract "begin[s] September 1, 2007 and continu[es] until August 31, 2008." Doc. 43-1 at 2.

2008, Texana paid Jain only $160,000 of his $165,000 salary (Doc. 46), that Texana paid Claire Friedman a proportionally greater salary than it paid to Jain and gave Friedman greater leniency as to her working hours, and that Jain "was required to work at a much different pace than white doctors at Texana." Doc. 42 at 10.

Jain complained about various employment policies and practices at Texana in three letters he sent to Texana CEO George Patterson in early June, 2009. Docs. 46-2, 47, 47-1. In the first letter, dated June 1, 2009, Jain referred to an apparently inordinate amount of sick leave he recently had taken and proposed that Texana dock $5000 of his outstanding pay from the September 2007 to September 2008 salary year and an additional $8250 from a forthcoming raise and donate that amount "to a good cause of Texana Center" to ensure that Jain's "sick days were adequately reimbursed back to Texana Center." Doc. 46-2. at 1. Jain also informed Patterson that he "still [had] to correct [his] days off applications on Employee service net." *Id.*

Additionally, Jain complained about an incident in which "Rosemary," apparently an employee of Texana, called Jain's wife while Jain was on a vacation in India and inquired into Jain's absence. Doc. 46-2. This exchange upset Jain's wife and Jain complained in the letter about the "unfair treatment." *Id.*

In the second letter, sent on June 5, Jain reported that he had "received some privileged communication" indicating that Texana was engaged in corrupt and racially discriminatory practices and asserting Jain was complicit in such practices. Doc. 47 at 1. Jain suggested that he previously had witnessed such discrimination, but never had personally participated in it. *Id.* He did state, however, that he had been the subject of "high handed arrogant treatment as well as unprofessional behavior from administration" and had "been given negative discriminatory treatment" while employed at Texana. *Id.* at 2. Jain called on Patterson and Texana to institute

clearer and more stringent policies to combat any perceived racial inequalities, including inequalities in salaries and employment accommodations for Texana physicians, before expressing his wish that "we can all move forward, past these hurdles to a better platform in impersonal and cordial manner [sic]." *Id.*

On June 9, Jain sent a third letter to Patterson in which he vehemently complained of Patterson and Texana's refusal to investigate Jain's previous allegations of racial discrimination. Doc. 47-1. He also complained that Patterson had started an administrative inquiry into Jain's use of sick leave despite Jain's previous offer to have his pay docked. *Id.* Apparently in response to an email from Patterson complaining of Jain's work schedule, Jain stated that Patterson was "right about [his] hours that it was 9-4 (including lunch schedule)" but that "from day one" of Jain's employment he did not take lunch but instead had been "scheduled to go from 9-3" and that this arrangement persistently had been reflected on Jain's clinic schedule. *Id.* at 1-2.

Jain also complained about apparent inequities in physician treatment at Texana, including that various doctors came and went at various hours of their choosing, and asked that "[a]ll the employees . . . be given equal hours of the work [sic] at equal pay scale." *Id.* Jain also mentioned the "widely prevalent firing of unusual [sic] high amount of black employees." *Id.* Jain also stated that he had consulted with a lawyer regarding his disputes with Texana and said that "it looks like we are going to litigation" over the continuing disputes. *Id.*

Jain has introduced his deposition testimony in which he claims that, in response to these letters, Texana began a "sham" investigation in which his "charts were reviewed" and Texana administrative staff were "looking at [his] different patients and talking to them." Doc. 44-1 at 3.

On July 7, Jain filed a charge of discrimination with the Texas Workforce Commission and the Equal Employment Opportunity Commission alleging that Texana "paid [him] a lesser

pay rate than other similarly qualified white non-Indian" physicians, that he "filed a written complaint with the CEO [of Texana] reporting the racial and color discrimination and has been subjected to retaliation since the filing," that he had "a different work load and patient evaluation times than other similarly qualified white non-Indian" physicians at Texana and that he believed these circumstances were due to his race, color, and national origin and in retaliation for his written complaints to Patterson. Doc. 45.

At 5:23 pm on August 5, 2009, Jain sent Patterson an email stating that he "need[ed] to take [his] available vacation at this time" and that Patterson should "consider [him] on vacation until further notice." Doc. 41-2 at 47. In response, Patterson sent Jain a letter the following day informing Jain that he was in "breach of [his] contractual duty to report to work" and that Texana terminated Jain's employment effective 5:00 pm, August 5. Doc. 41-2 at 48.

On March 22, 2010, the EEOC issued a "right to sue" letter in response to Jain's July 7 charge (Doc. 1-1) and on June 16, Jain filed his original complaint against Texana before this Court. Doc. 1.

## II. Summary Judgment Standard

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The substantive law governing the suit identifies the essential elements of the claims at issue, and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden falls on the movant to identify areas essential to the non-

movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Col. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). Moreover, if the party moving for summary judgment bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (the movant with the burden of proof "must establish beyond peradventure *all* the essential elements of the claim or defense to warrant judgment in his favor") (emphasis in original).

Once the movant meets its burden, the non-movant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323–24. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006). To do so, the non-movant must "go beyond the pleadings and by its own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is genuine issue for trial." *Webb v. Cardiothracic Surgery Assoc. of N. Tex., P.A.*, 139 F.3d 532, 536 (5th Cir. 1998).

Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris v. Covan World Wide Moving, Inc.*, 144

F.3d 377, 380 (5th Cir. 1998); *Grimes v. Tex. Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 139–40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (1992), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075.). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 198–200 (5th Cir. 1988). There is a "genuine" issue of material fact if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### III. Title VII

Title VII prohibits intentional discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "Where a defendant has moved

for summary judgment on an employment discrimination claim based on circumstantial evidence, as in this case, we apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*." *Turner v. Kansas City Southern Ry. Co.*, --- F.3d ----, ---, 2012 WL 985575, *3 (5th Cir. 2012) (citing 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

"Under that framework, the plaintiff must first establish a prima facie case of discrimination, which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

"To establish a prima facie case of retaliation, a plaintiff must show that (1) she participated in a Title VII protected activity, (2) she suffered an adverse employment action by her employer, and (3) there is a causal connection between the protected activity and the adverse action." *Stewart v. Mississippi Transp. Com'n*, 586 F.3d 321, 331 (5th Cir. 2009) (citing *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008).

"Once a plaintiff has made a prima facie case [of discrimination or retaliation], the employer must provide 'some legitimate nondiscriminatory reason' for the adverse action taken." *Ellis v. Compass Group USA, Inc.*, 426 Fed.Appx. 292, 295 (5th Cir. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802). "If the employer sustains its burden, the prima facie case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citing

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

Here, Jain and Texana agree that Jain is a member of a protected class. In the context of Jain's claims of discrimination, Texana disputes whether Jain was "qualified for the position at issue"[2] at the time it terminated his employment. The record, however, demonstrates that Texana believed Jain was qualified to work as a psychiatrist when it hired him and when it renewed his employment agreement after four months and again a year later.[3] The Court understands Texana's desire to pull at every thread in Plaintiff's case, but the contested issues in this case are not Jain's qualifications but whether he suffered adverse employment actions within the meaning of Title VII's provisions relating to discrimination and retaliation and, if he did, whether Texana had a legitimate, non-discriminatory reason for those actions.

Jain's initial charge to the EEOC alleged Texana discriminated against him when it "paid [him] a lesser pay rate than other similarly qualified white non-Indian" physicians, and gave him "a different work load and patient evaluation times than other similarly qualified white non-Indian" physicians at Texana. Doc. 45. Jain also included in his amended complaint claims that Texana assigned "more non-white patients and those without medical insurance" to Jain and other non-white doctors. Doc. 21-2 at 2. After Jain complained of these policies or actions, Texana began a "sham investigation" which led to Jain's constructive discharge. Very shortly after Jain's "constructive discharge," Texana did, in fact, terminate Jain's employment. *See* Doc. 41-2 at 48.

Jain thus advances claims both for discrimination and retaliation. In support of his claim for discrimination, he contends that Texana took adverse employment actions by 1) treating him

---

[2] Texana contends that the "evidence clearly establishes Plaintiff was not legally qualified for his position when Texana fired Plaintiff for job abandonment" because he previously had stated that he was taking vacation without notice. Doc. 41 at 22.

[3] Jain's employment agreements with Texana clearly memorialize Texana's opinion that Jain "has the experience and qualifications required to serve in the capacity as Psychiatrist." Docs. 43 at 1; 43-1 at 1.

differently than other doctors in his work schedule and workload, 2) paying him less than similarly situated doctors, 3) beginning an investigation that made working conditions so intolerable that Jain felt compelled to resign, thereby constituting a constructive discharge, and 4) terminating his employment. Jain's claim for retaliation alleges the latter two adverse employment actions. The Court addresses Jain's claims of discrimination and retaliation independently and analyzes each purported act of discrimination or retaliation to determine whether it can form part of Jain's prima facie case and whether, if so, Texana has met its burden of showing a legitimate, non-discriminatory reason for that action.

IV. Title VII Discrimination

1. Workload and Patient Assignment

The alleged discrimination in workload, patient evaluation times, and assignment of Jain's patients based on race, ethnicity, or insured status does not constitute an adverse employment action for the purposes of establishing a prima facie case of discrimination. In the Fifth Circuit, only "'ultimate employment decisions' . . . [are] actionable adverse employment actions . . . for Title VII discrimination claims." *McCoy v. Shreveport*, 492 F.3d at 560. Without demonstrating a change in responsibilities, pay, or benefits, Jain's claims that his workload was different from that of similarly situated employees do not, as a matter of law, constitute adverse employment actions.

2. Different Pay

Jain also asserts that he was paid proportionately less than similarly situated psychiatrists working for Texana. In his complaint and his motion for summary judgment, Jain contends that Claire Friedman, a Texana psychiatrist, is a similarly situated employee who was paid more than

he was.[4] Doc. 21-2, Doc. 42 at 18-19. Jain has introduced Friedman's employment agreement demonstrating that she was to work at 60% employment status (three days per week) from 8:00am to 5:00pm. Doc. 43-4. Friedman's employment agreement indicates that she worked two days per week at Texana's Missouri City clinic and one day per week at the Wharton Clinic. *Id.* at 6. For this, Texana paid Friedman $101,970 annually. *Id.* At the same time, Jain was paid $165,000 annually for 100% (five days a week for the same hours) working at the East Fort Bend Behavioral Health Clinic.

From this evidence, it is not at all apparent that Friedman is a "similarly situated employee" who was treated more favorably than Jain. In an effort to force a relevant comparison between their pay, Jain contends that 60% of his own salary would be only $99,000 and thus that Texana clearly paid Friedman proportionally more than it paid him. *See* Doc. 42 at 22. Moreover, Jain contends that "Friedman was given leniency as to when she had to physically be present at work. . . . [She] showed up at 8:30 a.m. and would leave by 4 p.m. . . . Thus, Dr. Friedman actually only worked 6.5 hours a day, three days a week." *Id.* Friedman was, therefore, working only a 48.75% work week and should only have been making $80,437.50 annually if her salary was proportionate to Jain's. *Id.* These mathematical postulations do not support Jain's claims. His argument assumes, without any proof, that compensation scales directly with hours worked, rather than reflecting a proportional amount added to a constant base. Without further evidence, the Court will not assume that a minor deviation in relative compensation is evidence of discrimination.

The Court also is unimpressed by Jain's self-serving misrepresentation of the hours he

---

[4] In his deposition, Jain also stated that he was comparing himself to Drs. Stuart and Soderstrom at other Texana facilities. Doc. 41-2 at 13. Jain has not discussed these other doctors in his complaint or his motion for summary judgment, nor introduced any evidence supporting his contention that they were both similarly situated to him and received a higher pay than he did. The Court therefore confines itself to Jain's comparison to Dr. Claire Friedman.

and Friedman actually worked. Although Texana paid Friedman only 3% more than her compensation would be for her scheduled hours *if* her pay scaled directly with scheduled hours,[5] Jain introduces affidavit testimony of another former Texana psychiatrist to support his argument that Friedman actually worked less than her scheduled hours and therefore was entitled to even less pay. In letters he wrote to Texana CEO George Patterson, however, Jain admitted that although his work hours were "9-4 (including lunch schedule),"[6] "from day one" of his employment Jain did nott take lunch but instead had been "scheduled to go from 9-3" and that this arrangement persistently had been reflected on Jain's clinic schedule. Doc. 47-1 at 1-2. The summary judgment evidence that Jain introduced, then, shows him working five six hour days per week–a 75% work week. If the Court applies Jain's own mathematics and assumes that $165,000 is fair remuneration for a full work week, Jain was entitled to a salary of $123,750 and was being overpaid by $41,250 annually. Furthermore, based on these figures, if Friedman was paid at the same effective rate as Jain relative to the hours she worked, she was entitled to $107,500 annually and was being *underpaid* by $5530.[7] The Court has not been called upon to resolve the inequities of Dr. Friedman's salary, only Dr. Jain's. Jain, however, has failed to introduce sufficient evidence that would support his claim that he was paid *less* than Friedman.

Additionally, the record before the Court fails to support Jain's contention that Friedman is "similarly situated." As the Court previously noted, Friedman worked only a 60% work week, which makes any comparison between their respective salaries purely speculative. Friedman worked at two Texana facilities, while Jain worked at only one, and neither worked at the same facility. Jain also admits that Friedman "performed evaluations on children and adolescents and . . . was board *eligible* in child psychiatry" while Jain saw only adult patients. Jain maintains that

[5] 101,970/99,000*100 = 103.
[6] The record indicates that Jain's scheduled hours were 8:00 am to 5:00 pm. Docs. 43 at 6, 43-1 at 6.
[7] (48.75/75) x 165,000 = 107,500.

12 / 19

they were both "hired for the same reason . . . 'for the position of Psychiatrist'" and therefore are similarly situated. Doc. 42 at 23 (quoting Docs. 43-1, 43-3). The Court disagrees. The record is replete with evidence of manifest and important differences between Jain and Friedman that make any comparison between them meaningless for the purpose of establishing Jain's prima facie case.

Nevertheless, even if Jain were able to make a prima facie case of discrimination based on the differences in salary between himself and Friedman, Texana has introduced sufficient summary judgment evidence to demonstrate a legitimate, non-discriminatory reason for the pay disparity. Affidavit testimony of Texana CEO Patterson supports Texana's contention that physicians' salaries are determined with reference to "numerous factors . . . [including] the applicant's experience, credentials, availability, and special responsibilities, as well as the particular service location at which the applicant has applied to work, the applicant's corresponding caseload at that clinic, and Texana's need to staff the position to adequately treat its patients." Doc. 43-1 at 2. Patterson also declared that "an experienced psychiatrist may be able to negotiate a higher salary than a psychiatrist that only recently completed his education . . . [and a] board certified and board eligible psychiatrist[], especially [one] certified or eligible in child psychiatry, may obtain a higher salary than those who are not board certified or board eligible." *Id.*

Texana also has introduced the affidavit testimony of Susan Rushing, who has substantial experience as the CEO of Burke Center, a regional mental health, mental retardation center similar to Texana, who states that such facilities typically "pay more for certification and/or training in a subspeciality area such as child and adolescent psychiatry." *Id.* at 50.

Despite there being no evidence that Texana paid Friedman at a higher relative rate than

it did Jain or that Jain and Friedman were similarly situated, Texana has met its burden of demonstrating a legitimate, non-discriminatory reason for any possible discrepancy. Jain has introduced no evidence, nor advanced any argument, to show that these reasons are pretextual and thus his claim of discrimination based on pay fails as a matter of law.

### 3. Constructive Discharge

Jain's contention that he was constructively discharged from Texana when Texana began a "sham investigation" into his professional conduct is unsupported by the summary judgment evidence and fails as a matter of law.

"A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign." *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771 (5th Cir. 2001). The Fifth Circuit has identified the following relevant factors to determine whether a constructive discharge has occurred: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not." *McCoy v. City of Shreveport*, 492 F.3d at 557 (citing *Hunt*, 277 F.3d at 771-72).

The summary judgment evidence, even viewed in the light most favorable to Jain, fails to demonstrate that he suffered a constructive discharge. He suffered no demotion, reduction in salary or job responsibility, no reassignment, and no offer of early retirement.

Jain contends that Texana began a "sham investigation in an attempt to ultimately get his license to practice psychiatry revoked." Doc. 42 at 23. In his complaint, Jain also alleges that Texana "put out the word" to Texana employees that they were to "report[] [Jain] for any

imagined fault." Jain has introduced what he purports to be the record of a text message sent to him by Scarlet Mellard, Texana's Business Office Coordinator, which reads, in its entirety "Haven't read it yet. In chart room. Rosemary is on a mission again. Complete control freak. Watch your back. They are watching you." Doc. 44.[8] Jain has also introduced what appear to be written statements made by two nurses, Karen West and Paulina Zelazana, apparently during the course of Texana's investigation. Docs. 49, 50. Jain characterizes the statements as "false allegations" that indicate a "sham investigation." The statements contain numerous complaints of Jain's unprofessional conduct including unwelcome advances, violation of Texana's policy against e-prescribing, refusing to accommodate "last minute" scheduling, and refusing to see patients. *Id.* Jain has introduced no evidence to support his contention that these statements were false. In fact, contrary to Jain's unsupported allegations, the summary judgment evidence indicates only that Texana conducted an investigation into Jain's professional conduct. There is no evidence that the investigation was calculated to encourage Jain's resignation, nor that Texana specifically sought to intimidate Jain with the threat of licensure revocation. Jain therefore has failed to meet the standard to demonstrate a constructive discharge.

### 4. Termination

Jain also has failed to plead a prima facie case for Title VII discrimination based on his termination. Although Texana undoubtedly sent Jain a letter of termination on August 5, 2010, Jain has failed to demonstrate that his termination constitutes treatment less favorable than that received by other, similarly situated employees outside of his protected group.[9] Jain has failed to

---

[8] The exhibit does not identify the sender of the message, the recipient, or the date on which it was sent. Other than the text as quoted above, in fact, the exhibit contains a single line reading "This mobile text message is brought to you by AT&T." *Id.*

[9] The Court also notes that Jain's discrimination claim based on his termination is at odds with his assertion that he was "constructively discharged," but proceeds under the generous assumption that Jain pleads the two claims in the alternative.

identify any Texana employee, let alone one similarly situated to himself, who engaged in similar conduct and went unpunished. The summary judgment evidence, including numerous letters and emails that Jain wrote, indicates that Jain violated Texana's policy against e-prescribing, took unapproved vacation time to make a trip to India, and subsequently notified Texana that he was taking vacation "until further notice" before Texana terminated his employment. *See* Docs. 46-2, 47, 47-1. Because Jain has failed to indicate that any other Texana employee was treated more favorably under similar circumstances, he has failed to make a prima facie case for discrimination based on his termination.

Moreover, the summary judgment evidence amply supports Texana's assertion that it had a legitimate, non-discriminatory reason for terminating Jain's employment. As the preceding discussion shows, Jain admitted to violating various Texana policies, took a three week vacation to India without approval, and subsequently announced that he was taking an unapproved vacation "until further notice." *Id.* In response, Texana informed Jain that he was in "breach of [his] contractual duty to report to work" and fired him. Doc. 41-2 at 48. In an attempt to demonstrate that Texana's proffered justification is pretextual, Jain does no more than refer, again, to evidence demonstrating that he violated Texana's policies and that Texana investigated him for such violations and assert, without any evidence, that the investigation was a "sham." Because Jain has offered no evidence that supports his assertion that Texana unlawfully discriminated against him when it terminated his employment, Texana is entitled to summary judgment on this claim.

IV. Title VII Retaliation

For many of the same reasons stated above, Texana is entitled to summary judgment on Jain's claims for Title VII retaliation. "To establish a prima facie case of retaliation, the plaintiff

must establish that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy*, 492 F.3d at 556-57. The *McDonnell-Douglas* burden shifting framework applies equally to claims of retaliation. *See McCoy*, 492 F.3d at 557.

Texana contends that Jain cannot make out a prima facie case for retaliation because he failed to engage in a protected activity. An employee engages in a protected activity when he "oppose[s] any practice made an unlawful employment practice" by Title VII or makes "a charge, testifie[s], assist[s], or participate[s] in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). *See also Grimes v. Texas Dep't of Mental Health*, 102 F.3d 137, 143 (5th Cir. 1996).

Jain's letters of June 1 and 5 were not, Texana asserts, a "protected activity" for the purposes of Title VII because they failed to put Texana on notice that Jain "was threatening a race-based, color-based, or national origina-based discrimination lawsuit. Texana fails to mention Jain's third letter in which Jain explicitly mentioned "allegations against administration [sic] of racial inequality" that constituted "illegal conduct." Doc. 47-1 at 1. Jain's June 5 letter also references "prevalent discriminatory practices" and demands that Texana institute "the strictest standards of racial equality" in response. Doc. 47 at 1. Even if the Court construes the evidence in the light most favorable to Jain, Jain has met his burden of showing that he engaged in a protective activity.

In response to this protected activity, Jain asserts, Texana began its investigation and subsequently terminated him. Jain alleges 1) that the investigation constituted an adverse employment action by itself and also 2) led to his constructive discharge, and that 3) his

termination was an adverse employment action. Because the Court previously has determined that the investigation did not constitute a constructive discharge and that Texana had a legitimate, non-discriminatory reason for the investigation as well as Jain's termination which Jain has failed to show was pretextual, the only question remaining is whether the investigation constituted an adverse employment action.

For the purposes of Title VII retaliation claims, an adverse employment action is one which "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). *See also McCoy*, 492 F.3d at 557.

Here, again, Jain has failed completely to introduce sufficient evidence to show that Texana's investigation was a "sham investigation" of a sort that would dissuade a reasonable worker from making or supporting charges of discrimination in the future. None of the evidence before the Court suggests any malice, or indeed any untoward behavior. The closest Jain has come is the single text message warning him to "watch his back." Doc. 44. Further, and as the Court previously discussed, the record is replete with evidence supporting Texana's contention that it had a legitimate, non-discriminatory reason for terminating Jain's employment. In fact, Jain's letters reference his numerous violations of Texana policies:  e-prescribing, unapproved vacation time, and work hours, which Texana subsequently investigated. Jain has introduced no evidence that these legitimate reasons are pretextual. Texana therefore is entitled to summary judgment on this claim.

Conclusion

For the foregoing reasons, the Court hereby

**ORDERS** that Defendant Texana's motion for summary judgment (Doc. 41) is GRANTED.

SIGNED at Houston, Texas, this 4th day of June, 2012.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE